QUINLAN AND TYSON, INC. *et al.*, Plaintiffs-Appellees, *v.* THE CITY OF EVANSTON *et al.*, Defendants-Appellants.

(No. 59723; )

First District (2nd Division)—January 28, 1975.

Jack M. Siegel, Corporation Counsel, of Evanston, for appellants.

Peterson, Ross, Rall, Barber & Seidel, of Chicago (Donald L. Padgitt, Russell M. Pelton, Charles Edwin Johnson, and Ellen J. Kerschner, of counsel), for appellees.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Plaintiffs Quinlan and Tyson, Inc., a real estate brokerage firm, and Jody Taylor, a sales representative of Quinlan and Tyson, filed a complaint in the circuit court of Cook County asking for administrative review (Ill. Rev. Stat. 1973, ch. 110, § 264 et seq.) of a finding by defendant Evanston Fair Housing Review Board that Quinlan and Tyson and Jody Taylor were guilty of engaging in various discriminatory practices in violation of the Fair Housing Ordinance of the city of Evanston. (Evanston, Ill., Code 1970, ch. 25½, § 25½-1 et seq.) The circuit court set aside the findings of the Evanston Fair Housing Review Board and defendants City of Evanston and the Evanston Fair Housing Review Board take this appeal.

The apparent applicability of two recent Illinois Supreme Court de-

cisions, *Cummings v. Daley*, 58 Ill.2d 1, 317 N.E.2d 22, and *Paper Supply Co. v. City of Chicago*, 57 Ill.2d 553, 317 N.E.2d 3, regarding the use of the Administrative Review Act by municipal administrative agencies requires comment before proceeding to the merits of this appeal. We conclude that, although these two cases require invalidation of that section of the Evanston ordinance incorporating the Administrative Review Act, they do not require a dismissal of the instant appeal for lack of jurisdiction.

The Evanston Fair Housing Ordinance under which plaintiffs were charged and convicted states:

> "Any broker whose license has been suspended or revoked, or any complainant aggrieved by the decision of the Board, shall have full right to appeal from such order of suspension or revocation in accordance with procedures specified in the Administrative Review Act of Illinois." (Evanston, Ill., Code 1970, ch. 25½, § 25½–17.)

It was apparently pursuant to this authorization that plaintiffs sought administrative review in the circuit court of Cook County of the Board's findings. However, after the circuit court had set aside the Board's findings, the Illinois Supreme Court decided *Paper Supply Co. v. City of Chicago*, 57 Ill.2d 553, 317 N.E.2d 3.

In *Paper Supply Co.*, the city of Chicago had made the Administrative Review Act applicable to the administrative decisions rendered under Chicago's "head-tax" ordinance. However, the court held such a provision invalid, stating:

> "The method of judicial review of the decisions of the defendant city's administrative agencies is not a 'function pertaining to its government and affairs' within the contemplation of section 6 of article VII of the Constitution of 1970 [Home Rule provisions], and the determination of the manner or method of such review is not within the powers conferred upon the City." 57 Ill.2d 553, 580.

The court relied on *Paper Supply Co.* in the subsequent case of *Cummings v. Daley*, 58 Ill.2d 1, 317 N.E.2d 22. In *Cummings*, the Chicago Fair Housing Ordinance had incorporated the Administrative Review Act of Illinois in a provision almost identical to the provision now before us in the Evanston Fair Housing Ordinance. However, again, the court invalidated that provision, holding that the city did not have the power to choose the particular method of judicial review of its administrative agencies.

 It is clear that if the home-rule provisions of the Illinois Constitution did not grant the necessary power to the city of Chicago to choose

a particular method of judicial review, neither did the city of Evanston have the necessary power to do so. In *Cummings* the court invalidated a provision strikingly similar to the provision before us. We have no alternative but to do likewise.

■■ However, although the section in the Evanston ordinance conferring jurisdiction in the circuit court through the Administrative Review Act was invalid, it does not necessarily follow that the circuit court was without jurisdiction. The Administrative Review Act did not expand the subject matter jurisdiction of the circuit courts. Circuit courts have historically had jurisdiction to review administrative decisions as provided by law. (Ill. Const. (1870), art. VI, § 9; Ill. Const. (1970), art. VI, § 9.) The purpose of the Act was to dispense with the use of mandamus, certiorari, injunction and other actions as a means of reviewing the decisions of administrative agencies, and thus to provide a single uniform method of review. (*People ex rel. Builders Supply & Lumber Co. v. Village of Maywood*, 22 Ill.App.2d 283, 160 N.E.2d 689.) The Administrative Review Act provides a simple single procedure for a review from specified administrative decisions, but it was not intended to be a trap for the unwary or to establish a bar to relief. (*Chestnut v. Lodge*, 34 Ill.2d 567, 216 N.E.2d 799.) It thus appears that the Administrative Review Act did not change or expand the subject matter jurisdiction of the circuit courts; it merely provided a single vehicle for the exercise of that jurisdiction in specified cases.

Consequently, the instant facts do not present a lack of subject matter jurisdiction, but rather, the utilization of the improper vehicle for exercising that jurisdiction. As the cases decided before enactment of the Administrative Review Act make clear, the proper method for review of administrative decisions was by writ of certiorari. (*People ex rel. Elmore v. Allman*, 382 Ill. 156, 46 N.E.2d 974.) And although the Administrative Review Act has replaced certiorari for review of State administrative agencies, it appears certiorari has remained the appropriate method for review of municipal administrative agencies. In view of the foregoing principles, two possible dispositions of the instant case emerge: [1]
(1) a remand of the instant case so that plaintiffs may petition the circuit court for a writ of certiorari, or (2) that this court view the instant record as though a writ of certiorari had already been granted. However, after

---

[1] Neither *Cummings* nor *Paper Supply Co.* indicate the proper disposition of a case once the Administrative Review Act has been found inapplicable. In neither case was the court presented with facts requiring such disposition. *Paper Supply Co.* was an action for declaratory judgment in which no administrative decision was being challenged. In *Cummings*, the plaintiff had inexplicably already chosen to proceed by way of *certiorari* rather than the Administrative Review Act.

a review of the law applicable in a certiorari proceeding, we conclude that a remand of the instant case would serve no useful purpose, and accordingly, we will view the instant case as though certiorari had been granted by the circuit court.[2]

■■■ The procedure for judicial review of administrative decisions by way of certiorari is not unlike the procedure for review by way of the Administrative Review Act. In a certiorari proceeding, the relevant records of the administrative agency are brought before the court. The record must show that the agency acted upon evidence, and it must contain the testimony upon which the decision of the agency was based. (*Carroll v. Houston*, 341 Ill. 531, 173 N.E. 657.) The trial is to consist only of an inspection of the records of the agency. (*Goodfriend v. Board of Appeals*, 18 Ill.App.3d 412, 305 N.E.2d 404.) In such proceedings, the court cannot consider any matter not appearing of record. (*People ex rel. Nelson Brothers Storage & Furniture Co. v. Fisher*, 373 Ill. 228, 25 N.E.2d 785.) The only province of the trial court is to consider the record and ascertain whether the agency had jurisdiction, whether it exceeded its jurisdiction, whether it proceeded according to law and acted on evidence, and whether there is anything in the record which fairly tends to sustain the action of the agency. Where the agency is not arbitrary in its findings and there is evidence in the record of its proceedings which fairly tends to support the finding, a reviewing court is not justified in substituting its judgment for the discretion and judgment of the agency. (*Prendergast v. Retirement Board*, 325 Ill.App. 638, 60 N.E.2d 768.) In such cases the question before the court is never whether the agency's decision is wise or discreet, but only whether there is any evidence fairly tending to support the order reviewed. *Mayor v. Dean*, 62 Ill.App. 41; *Superior Coal Co. v. O'Brien*, 383 Ill. 394, 50 N.E.2d 453.

■■ In view of these principles, it is clear that no useful purpose would be served by a remand of the instant case for the issuance of a writ of certiorari. The circuit court could consider no additional testimony or record than that which is before this court. Similarly, neither the circuit court nor this court should weigh the evidence, draw inferences of fact, or substitute its judgment for that of the administrative agency. As set out above, the role of a reviewing court in a certiorari proceeding is limited and clearly defined. Since the circuit court would be in no more advantageous position to review this record than this court already is,

---

[2] We note that although both parties urged this court to disregard *Cummings* and *Paper Supply Co.* and reach the merits of this case, we cannot disregard decisions of the Supreme Court and are considering the merits of this case only because *Cummings* and *Paper Supply Co.* do not preclude such a consideration.

we will consider the record as though certiorari had been granted by the circuit court. *Cf. Mandis v. Gorski* (1965), 24 App.Div.2d 181, 265 N.Y.S.2d 210.

It must be emphasized that the procedural facts presented by this case are highly unusual. Until the supreme court decided *Paper Supply Co.*, the use of the Administrative Review Act by municipal administrative agencies had not been questioned by either the courts or the members of the bar. The litigants in the instant case cannot be faulted for not having anticipated the holding in *Paper Supply Co.* To now require these parties to return to the circuit court and start the litigation anew would be unduly harsh and, in view of the reasons above, unneeded. To require these parties to commence a new action merely to put a different label on the record already before us would elevate the technical subtleties of pleading to a degree far greater than that required to maintain an orderly system of justice and would result in unneeded delay and expense. Instead, this court will apply the fundamental principle that courts should consider the substance of litigation and not the form. In so doing, effect will be given to the dictates of the Civil Practice Act that require the rules of civil practice to "be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive rights of the parties." (Ill. Rev. Stat. 1973, ch. 110, § 4.) We conclude that substantial justice for all parties requires such a disposition and accordingly, will review the Board's order under the certiorari principles set out above.[3]

We now turn to the merits of the instant appeal. Plaintiff Quinlan and Tyson is a corporation engaged in the real estate business in the City of Evanston and elsewhere in the Chicago area. Plaintiff Jody Taylor was a sales representative employed by Quinlan and Tyson at their Winnetka, Illinois, office. The Evanston Human Relations Commission filed a complaint with the Evanston Fair Housing Review Board (Board) against plaintiffs alleging the violation of four sections[4] of the Fair Housing Ordinance of the City of Evanston. At a hearing on the complaint, the Board heard the testimony of two witnesses.

Joanne Eannarino testified that at the request of the Evanston Human Relations Commission she went to the Winnetka office of Quinlan and Tyson to find out whether or not white people would be shown Evanston

---

[3] We are aware of our colleagues' contrary holding in *Nowicki v. Evanston Fair Housing Review Board*, 25 Ill.App.3d 129, ―― N.E.2d ――, and respectfully differ.

[4] The Board specifically found no violation of one section of the ordinance. The propriety of that finding has not been questioned and is therefore not before the court.

property if they went looking in other areas of the North Shore. At the Winnetka office, she was referred to plaintiff Jody Taylor, and told Taylor she had two young children and was interested in houses for sale in the $35,000 to $40,000 range with three or four bedrooms in communities with good schools. She also informed Taylor that she was completely unfamiliar with the North Shore area. Taylor took out a map of the immediate area and began describing the different communities. Eannarino then mentioned that, although Evanston was named at the bottom of the map, it was not part of this particular map. Taylor then commented that there are problems with a young family buying in Evanston because they would probably want to move in a few years and property is hard to sell in certain areas of Evanston. She explained that it was hard to sell because there were "coloreds living in the area." Eannarino said nothing in response, and the meeting continued. Taylor then gave Eannarino a series of multiple-listing books. The first books contained Winnetka, Wilmette, and Glencoe. While they paged through the books, Taylor mentioned that there was only one black family in Kenilworth, three black families in Wilmette, and that all the black families in Glencoe live in one area. Although Eannarino did not request it, the last multiple listing book given her was of Evanston. While looking through the Evanston book, Eannarino found an 11-room house for $20,000. She told Taylor, "This is really a buy." Taylor responded, "I don't think you'd be interested in it. That is in the colored area of Evanston." However, again Eannarino made no response and did not inquire further about the house. At other points in the conversation, Taylor said there are two nice areas of Evanston; the other areas are where the colored live. Finally, at the end of the 1½-hour visit, Eannarino asked where the colored area of Evanston was located. Taylor replied, "In the southwest part." That was the only time Eannarino had asked any questions regarding racial characteristics of the communities. As Eannarino was leaving the office, Taylor gave her a list of houses she could drive by, and if interested in any of them, Taylor would arrange an appointment to see them further. On cross-examination, Eannarino admitted she didn't ask to see any particular houses nor did she ask to see any particular listings. She also stated that the Winnetka office of Quinlan and Tyson was in the middle of the map she was shown and she wasn't surprised Evanston was not on that map.

Jody Taylor also testified before the Board. She had been a sales representative for 15 years and was merely trying to meet Eannarino's needs. When Eannarino mentioned the $20,000 house in Evanston she said, "I don't know the house. I do know the area. That is an over-

crowded area because there are apartments. And the houses are near together. And I wouldn't think a young couple with two childen would want to come in that area." However, she admitted that she also said it was an integrated area. In response to a question from a member of the Board as to why Taylor mentioned the integrated area and why she just didn't offer to show the house. Taylor responded:

"I did tell her I would take her out. I told her that. I told her to come with her husband and I even told her she could bring her children and we would look at anything she wanted to see."

In response to another question from the Board, Taylor stated she did not include the $20,000 house on the list of houses to drive by because it was in a congested area. The houses listed were not in crowded areas. Taylor claimed that she did not try to steer Eannarino away from Evanston and pointed out that of the four houses she asked Eannarino to drive by, two were in Evanston. On cross-examination, it was elicited that although Eannarino never raised the racial characteristics of an area until the end of the visit, she also never said she wanted to live in an integrated area. Taylor explained that the reason Eannarino was given the Evanston multiple-listing book last was because it was only natural for the Winnetka office to show homes in the Winnetka area first. She reasoned that if Eannarino wanted to live specifically in Evanston, she would have gone to the Quinlan and Tyson office in Evanston.

The Board subsequently issued a written report containing certain "findings." Although no specific sections of the Fair Housing Ordinance were mentioned, the Board concluded that plaintiffs were guilty of discriminatory practices in violation of the ordinance, and fines were levied.

On a complaint for administrative review, the circuit court found that the Board's findings were contrary to law and against the manifest weight of the evidence, and that the Board should have dismissed the complaint of the Human Relations Comission for its failure to serve a copy of the complaint on the persons charged within 5 days after the filing of the complaint. On those grounds, the circuit court set aside the decision of the Board. We now review that order, although under the admittedly more limited scope of certiorari review.[5]

Defendants raise two issues on appeal: (1) whether the Board was

---

[5] Although the court's order concluded that the Board's findings were against the manifest weight of the evidence, the trial judge during the hearing on the complaint several times referred to the fact that there was "no" evidence to support the findings. Accordingly, it is not unreasonable to assume that even under the more limited standard of review for certiorari, the trial judge would have quashed the Board's return.

required to dismiss the complaint for failure to serve a copy of the complaint within the required time, and (2) whether the decision of the Board was against the manifest weight of the evidence.[6]

The complaint was filed by the Human Relations Commission on May 30, 1972. Although the record is far from clear, it appears that a copy was sent by certified mail to plaintiffs on June 5, 1972.[7] The ordinance requires service of a copy of the complaint personally or by certified mail within 5 days. (Evanston, Ill., Code 1970, ch. 25½, § 25½—17.) The circuit court found, and plaintiffs now argue, that the interval of 6 days between filing and mailing of the complaint required dismissal of the complaint.

■■ Defendants argue that although the 6-day interval would seem to be in contravention of the ordinance, plaintiffs have waived any possible irregularity. The complaint was mailed to plaintiffs on June 5, 1972. However, plaintiffs motion to dismiss the complaint based on this irregularity was not received by the Board until October 27, 1972, and was not argued and decided until November 2, 1972. In the interval, plaintiffs not only filed an answer to the complaint, but over a 5-month period participated in efforts to conciliate the complaint. The answer did not in any respect challenge the late service of the complaint, nor was this defect raised during the conciliation efforts. It thus appears that plaintiffs not only delayed over 4 months in complaining of the alleged defect but that they actively participated in the prior litigation of the complaint. We conclude that plaintiffs' delay coupled with their participation in the case constituted a waiver of any possible defect in service of the complaint. See *Lovell v. Hastings,* 11 Ill.App.3d 221, 296 N.E.2d 608; *Pocahontas Mining Co. v. Industrial Com.,* 301 Ill. 462, 134 N.E. 160.

■■ However, even if plaintiffs had properly preserved their objection for review, the Board was not required to dismiss the complaint. Although the ordinance states that service must be made within 5 days, the ordinance does not indicate nor do plaintiffs cite any authority for the proposition that the requirement is jurisdictional. Such a provision can be called jurisdictional when the language is mandatory, and in that case any subsequent acts would be void unless the requirement had been fulfilled. However, such language can also be directory, and in that case

---

[6] Which we take to mean: whether there was any evidence which fairly tends to support the Board's decision.

[7] It was been extremely difficult to determine when letters or pleadings were sent or received. It seems the Board does not time stamp material at its receipt. This difficulty has been compounded by the different dates mentioned at the hearing before the Board, in the briefs filed in this court and the occasional notation made by hand on the pleadings in the record.

failure to comply with the requirement would not render subsequent proceedings void. Determining whether a provision is mandatory or directory is largely a matter of ascertaining legislative intent. The court in *Carrigan v. Illinois Liquor Control Com.,* 19 Ill.2d 230, 166 N.E.2d 574, noted the difference betwen provisions intended to guide public officers in the conduct of their business and those provisions negative in character which suggest that an act cannot be done unless within the required time. We feel the instant provision falls within the former category. It seems clearly to be one designed to secure order, system, and dispatch in proceedings. It is not of the type used to determine legal rights, but merely to indicate that certain things be done in a given way at a certain time. (*In re Annexation of Certain Territory to the City of Darien,* 16 Ill.App.3d 140, 304 N.E.2d 769.) And as noted above, there is no declaration in the ordinance itself that conformity to this provision is essential to the validity of subsequent proceedings under the ordinance. Indeed, the ordinance declares that it should be liberally construed so as to achieve its purpose of providing an equal opportunity to all persons in the purchase and renting of real estate. Evanston, Ill., Code 1970, ch. 25½, § 25½—3.

 A factor to be considered when giving such language a directory construction is whether that interpretation may result in any injury to an individual or to the public generally. (*People ex rel. Landwehr v. Humbracht,* 215 Ill.App.29.) In the instant case the ordinance requires the Board to "promptly" hold a hearing if conciliation cannot resolve the complaint within 14 days. (Evanston, Ill., Code 1970, ch. 25½, § 25½ —17.) Thus, the ordinance implicitly infers that any person charged under the ordinance would have notice of the complaint due to the attempt at conciliation, regardless of a formal receipt of the complaint. Moreover, that same section of the ordinance requires the Board to give "due and reasonable notice to all parties" of the hearing once conciliation has failed. Thus any individual charged under the ordinance would have ample notice of the complaint even if the 5-day requirement was not strictly met. That this is true is borne out by the record below. At no time during the hearing before the Board, or at the hearing in the court below, or in the briefs filed in this court have plaintiffs claimed any injury or prejudice due to the late receipt of the complaint. It is also clear that there will be no injury to the public generally by such a construction that the language is directory. Rather, such a construction would only benefit the public by insuring their right to demand redress for any discrimination in housing. After considering the intent of the city council as evidenced by the apparent purpose of the provision, the possible injury to any individual, and the possible benefit to the public generally,

we hold that the language of the provision is directory rather than mandatory. Accordingly, the Board was not required to dismiss the complaint.

The second issue raised by defendants is whether there was insufficient evidence to sustain the Board's decision. When review is by writ of certiorari, as in the instant case, the cases uniformly hold that the standard to be applied is whether there is any evidence in the record reasonably tending to sustain the decision of the Board. (*O'Brien v. Retirement Board,* 343 Ill.App. 630, 99 N.E.2d 681.) In a common-law writ of certiorari proceeding the reviewing court has no power to weigh the evidence and is not justified in substituting its judgment for the discretion and judgment of the agency. (*Byrnes v. Retirement Board,* 339 Ill.App. 55, 89 N.E.2d 59; *Prendergast v. Retirement Board, supra.*) The complaining party does not have an opportunity to have the case retried; if there is any evidence which fairly tends to sustain the Board's decision, it cannot be disturbed. (*People ex rel. Fosse v. Allman,* 329 Ill.App. 296, 68 N.E.2d 203.) It is with this limited role of the reviewing court in mind that we now turn to the Board's decision.

The complaint filed with the Board by the Evanston Human Relations Commission alleged the violation of three sections of the Evanston Fair Housing Ordinance. The Board's written report did not refer to any specific section of the ordinance. Instead, after making findings of fact, the report merely concluded that plaintiffs engaged "in discriminatory practices in violation of the" ordinance. On appeal, three sections have been advanced to sustain the Board's action.

Two of those sections provide that it shall be unlawful to:

> "Refuse to show real estate because of the race, color, religion, or national origin of any prospective purchaser, lessee, or tenant, or because of the race, color, religion, or national origin of the residents in the area in which the property is located. (Evanston, Ill., Code 1970, ch. 25½, § 25½—6(j).)
>
> Fail to show real estate because of the race, color, religion, or national origin of any prospective purchaser, lessee, or tenant, or because of the race, color, religion, or national origin of the residents in the area in which the property is located." (Evanston, Ill., Code 1970, ch. 25½, § 25½—10(1).)

Defendants contend that these two sections taken together prohibit what is commonly called "steering" that is, an attempt to guide white buyers away from housing in a black or integrated area.

Defendants argue that the whole tenor of Taylor's comments was to steer Eannarino away from Evanston. They specifically note the comments that property is hard to sell in Evanston, that only two sections

of Evanston are nice, that there are only a small number of black families in other suburbs, and that Eannarino would not be interested in the $20,000 house because it is in an integrated area.

■■ However, defendants fail to note the clear language of the ordinance. The ordinance prohibits the refusal to show or the failure to show. They do not, even when taken together, prohibit steering. The language used is plain and unmistakable. In the absence of a different legislative intent, courts will assume that such words have their ordinary and popularly understood meaning. (*People v. Blair*, 52 Ill.2d 371, 288 N.E.2d 443.) Defendants ask this court to consider both sections and declare that together they prohibit steering. However, it is settled law that the courts can neither restrict nor enlarge the plain meaning of an unambiguous statute. *Bovinette v. City of Mascoutah*, 55 Ill.2d 129, 302 N.E.2d 313.

The sections before us do not prohibit discouraging prospective purchasers of real estate (see *State v. Wagner* (1972), 15 Md. App. 413, 291 A.2d 171), nor do they prohibit hindering prospective purchasers. The sections plainly prohibit the refusal or failure to show real estate. Such language implicitly requires at least a request to see property before there can be a refusal or failure to show that property. In *State v. Wagner, supra*, the court was faced with a statute that prohibited steering as defined by defendants. In that case, a Maryland statute made it unlawful to discourage another person from purchasing real property, by representations regarding the existing or potential proximity of real property owned, used, or occupied by persons of any particular race, color, religion, or national origin, or to represent that such existing or potential proximity will or may result in: 1. the lowering of property values * * *. (Md. Ann. Code 1972, art. 56, § 230A.) The difference between the Maryland statute, clearly designed to prohibit steering, and the one presently before us is obvious.

Another case which highlights the difference between what Evanston prohibited and what Evanston could have prohibited is *Zuch v. Hussey* (E.D. Mich. 1973), 366 F.Supp. 553, where steering was held to be a violation of section 3604(a) of the Fair Housing Law (42 U.S.C. § 3604(a) (1973)). Section 3604(a) made it unlawful:

> "To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin."

However, after defining steering as any word or action by a real estate broker or salesman which is used to influence the choice of a prospective homebuyer on a racial basis, the court concluded that the specific pro-

hibitions "to refuse to sell or rent" and "to refuse to negotiate" were insufficient to include a prohibition of steering. Instead, the court relied on the general prohibition to "otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, or national origin." While the court in *Zuch* could point to language "as broad as Congress could have made it," we cannot point to such language in the sections of the Evanston ordinance advanced to support the convictions. We agree with the court in *Zuch* that the specific prohibitions "to refuse to sell or rent" and "to refuse to negotiate" are "applicable in unmistakable circumstances." And it is for just that reason that we cannot now hold that the specific prohibitions in the Evanston ordinance also prohibit steering.

■■ The act of discouraging a prospective purchaser and the act of refusing or failing to show a prospective purchaser real estate are separate and distinct acts. The Evanston city council chose to prohibit the latter; this court cannot now change the plain meaning of the ordinance to prohibit steering. We emphasize that we do not reach the question whether Taylor's conduct would violate such a provision had the city of Evanston seen fit to enact one. We merely hold that those sections of the Evanston ordinance advanced to support the present convictions, even when taken together, do not prohibit steering.

We now turn to whether Taylor's conduct constituted a refusal or failure to show real estate. The plain meaning of the word "refused" indicates a prior request by another. Similarly, the plain meaning of the word "failed" indicates some act of omission, something left undone. In the instant case, after a careful review of all the testimony, we can find no evidence of either a refusal or failure to show real estate on the part of Taylor.

Eannarino admitted that she never asked to see any particular house. Indeed, she never even asked to see the Evanston multiple-listing book. Defendants argue that Taylor's comment, "I don't think you'd be interested in it. That is in the colored area of Evanston," can be construed as an outright refusal. Defendants suggest the clear implication was that Taylor would not show that house. However, defendants fail to note that Eannarino never asked to see that house. She merely said, "This is really a buy." Such a comment cannot possibly be interpreted as a request to see that house. Moreover, Eannarino said nothing in response to Taylor's comment. She did not in any way indicate a desire to see the house despite the fact that it was in a black area. Not once in their 1½-hour conversation did Eannarino ask to see any house or listing. Neither did she express any dissatisfaction with what she was shown. Although Taylor's comment might possibly constitute discouragement, since Eannarino

never made a request, there can be no refusal. See *Bell Realty & Insurance Agency v. Chicago Commission on Human Relations,* 130 Ill.App.2d 1072, 266 N.E.2d 769.

Similarly, there was never a failure to show real estate. Eannarino was given the listing books for Evanston even though she never requested them and even though Evanston was two suburbs away. As Eannarino was leaving, Taylor gave her four homes to drive by, all of which fit the type of home Eannarino had asked for, and two of which were in Evanston. Although the $20,000 home was not on the list, Eannarino had seen the listing and could easily have asked to see it, but didn't. Finally, Taylor offered to let her see anything she wanted to. It is difficult to imagine what else Taylor could have done.

In addition to the affirmative actions taken by Taylor, there is no evidence in the record of any available housing that was kept hidden from Eannarino, the usual purpose of a "failure to show" ordinance. Eannarino admitted that she was given the listing books for all the surrounding suburbs, including Evanston, and was allowed an opportunity to look through them herself.

■■ We conclude that there was no evidence to support any finding by the Board that plaintiffs refused to show real estate or failed to show real estate.

Finally, we turn to the last section of the ordinance advanced to support the Board's finding. Section 25½—6(f) makes it unlawful to:

> "Make any misrepresentations concerning the listing for sale or the anticipated listing for sale or the sale of any real property for the purpose of inducing or attempting to induce the sale or listing for sale of any real property by representing that the presence or anticipated presence of persons of any particular race, color, religion, or national origin in the area will or may result in the lowering of real property values in the block, neighborhood, or area in which the property is located." (Evanston, Ill., Code 1970, ch. 25½, § 25½—6(f).)

That section is generally agreed to be the "anti-blockbusting" section of the ordinance. It seeks to prohibit the practice of soliciting sales of residential property on grounds of the future loss of value of the properties due to a prospective or present entry into the neighborhood of homeowners of a different race or origin.

There is again no evidence to support a finding of a violation based on this section. This section is concerned with inducing the sale of property. Eannarino wanted to buy property. This section declares it unlawful to make any misrepresentation concerning the sale of the real property.

Again, there was neither any misrepresentation nor any attempted sale. The section is obviously intended for the protection of homeowners. But again, Eannarino was a buyer, not an owner.

That this section is not applicable was conceded by defendants during the hearing before the circuit court. Now on appeal, defendants contend that the section does apply. Defendants argue that Taylor was attempting to sell real estate in other areas of the North Shore by representing that property in Evanston is harder to sell because there are blacks living there. We reject such a strained reading of the ordinance. The ordinance makes it unlawful to make representations about the area in which you want someone to sell—not some other area as argued by defendants. Moreover, there was no testimony that Taylor predicted that property values would go down, as required by the ordinance. Finally, as mentioned above, it is agreed by all that this is a "blockbusting" statute, and there is absolutely no evidence that Taylor was engaged in any such activity.

■■ We note that this exact same fact situation was presented in *Abel v. Lomenzo* (1966), 25 App.Div.2d 104, 267 N.Y.S.2d 265, *aff'd,* 18 N.Y.2d 619, 219 N.E.2d 287. In that case, the court similarly rejected the contention that advising prospective purchasers of the racial composition of various neighborhoods violated a New York blockbusting statute. We conclude that none of Taylor's comments constituted a violation of the blockbusting section of the ordinance.

It must be emphasized that we intimate no opinion on the validity of an antisteering statute, nor on the validity of an ordinance that prohibits real estate brokers from informing prospective purchasers of real estate of the racial composition of areas in which they express an interest. We merely hold that there was no evidence which reasonably tends to support violations of the three sections of the ordinance advanced.

Accordingly, the decision of the circuit court setting aside the decision of the Fair Housing Review Board is affirmed.

Affirmed.

LEIGHTON and HAYES, JJ., concur.